U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

2013 DEC -3  AM 11: 30

CLERK

BY _____
DEPUTY CLERK

| | | |
|---|---|---|
| WILLIAM LEFEBVRE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 5:12-cv-163 |
| | ) | |
| ADAM MICKEL, | ) | |
| MARK POTANAS, and | ) | |
| JOSHUA RUTHEFORD, | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION AND ORDER ADOPTING IN PART**
**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**
(Docs. 30 & 32)

This matter came before the court on the objection of Plaintiff William Lefebvre (Doc. 35) to the Magistrate Judge's Report and Recommendation ("R & R") filed on July 31, 2013 (Doc. 32).

Plaintiff's complaint, which alleges a violation of 42 U.S.C. § 1983, arises out of his allegations that certain prison officials within the Vermont Department of Corrections (the "Vermont DOC" or "DOC") failed to protect him from multiple assaults by another prisoner and that those officials subsequently failed to protect Plaintiff from ongoing emotional distress resulting from those assaults. Defendants are Adam Mickel, the Living Unit Supervisor; Joshua Rutherford, the Chief of Security; and Mark Potanas, the Superintendent, who were all employed at the correctional facility where Plaintiff was incarcerated when the assaults occurred. Plaintiff claims that he reported the instances of sexual assault to Defendants to no avail, and that he filed multiple grievances to which Defendants failed to adequately respond.

The R & R recommends that Defendants' motion to dismiss (Doc. 30) be granted primarily because Plaintiff has failed to exhaust his administrative remedies within the

Vermont DOC, as required by the Prison Litigation Reform Act of 1995, 42 U.S.C. § 1997e (the "PLRA"). The court agrees with this conclusion and therefore does not address the adequacy or plausibility of Plaintiff's Eighth Amendment claims.

Plaintiff is self-represented. Defendants are represented by Vermont Assistant Attorney General David R. McLean.

## I.   **Factual Background.**[1]

Plaintiff's original Complaint outlined his allegations concerning multiple sexual assaults perpetrated by his cellmate, Bubba Lake, between November 10, 2011 and November 14, 2011, and the response of prison officials thereafter. At that time, Plaintiff was incarcerated at the Southern State Correctional Facility (the "SSCF").

According to Plaintiff's Complaint, on November 10, 2011, Lake was moved into Plaintiff's cell, and sometime after Lake started pressing Plaintiff to perform oral sex on him. Plaintiff alleges that Lake continued to ask and that Plaintiff told Lake "no" but that the "more [Plaintiff] said no the angr[ier] [Lake] got." (Doc. 5 at 8.)   Plaintiff alleges that Lake then "started to poke" him when he was lying on his bunk and that Lake would not stop when Plaintiff told him to do so. *Id.* at 8-9. Lake then allegedly told Plaintiff that "the only way he would leave [Plaintiff] alone" was if Plaintiff performed oral sex on him. *Id.* at 9. Because Plaintiff felt he would be physically hurt if he did not "cooperate," he capitulated to Lake's demands and performed oral sex on him. *Id.* Plaintiff was "really scared." *Id.* Plaintiff alleges "the same thing happened again despite [him] constantly saying no." *Id.*

---

[1] While a district court need not review *de novo* those portions of the Magistrate Judge's R & R to which there are no objections, it is unclear from Plaintiff's objection whether he has objected to the factual background outlined in the R & R. Further, the factual background of this case is complicated by reason that Plaintiff's Amended Complaint appears to supplement, rather than supersede, his original Complaint, despite the Magistrate Judge's observations that Plaintiff's Amended Complaint should "contain all claims against all parties, as it will supersede the original Complaint in all respects." (Doc. 23 at 24; *see also* Doc. 32 at 2 n.3.) According leniency to Plaintiff as he is self-represented, the court outlines the factual background as presented in both Plaintiff's Complaint and Amended Complaint. For the purposes of ruling on the pending motion, the court accepts the allegations contained in both complaints as true.

Two nights later, Plaintiff alleges that Lake again starting poking him when he was lying on his bunk. Lake then allegedly asked Plaintiff to allow Lake to engage in anal sex, and Plaintiff said no. Lake "continued to ask and [Plaintiff] continued to say no." *Id.* at 10. Lake then "started getting mad and punching the walls," which "really scared" Plaintiff. *Id.* When Plaintiff asked Lake if he "had to," Lake replied "yes" or Plaintiff "would get hurt." *Id.* Lake then directed Plaintiff to get out of his bunk, stand by the door, and bend over, and Lake then started to perform anal sex on Plaintiff.

On November 14, 2011, Plaintiff reported that he had been the victim of a sexual assault to "Yard Officer COI Hayes," who allegedly told Plaintiff to return to his unit and that he would report the sexual assault to "CSS Mickel," the Living Unit Supervisor at the SSCF. *Id.* at 7. Approximately thirty minutes later, Defendant Mickel called Plaintiff in to speak with him. Plaintiff informed Defendant Mickel that he "was a victim of sexual assault and feared for [his] safety." *Id.* Following his meeting with Defendant Mickel, Plaintiff was taken to meet with "SOS Rutheford," to whom he reported that he had been "sexually assaulted by Bubba Lake on three different [occasions]." *Id.* at 7-8. Defendant Rutherford, who Plaintiff refers to as "Rutheford," is the Chief of Security at the SSCF.

After Plaintiff reported the sexual assaults to Defendant Rutherford, he was "sent to see Ruth Kibby from mental health." *Id.* at 11. He allegedly told her that he feared for his safety and that he felt like he was not going to be taken seriously. He was then taken to medical, where a nurse denied his request to be taken to the hospital, allegedly stating "there was no point [] because [Plaintiff] had already shower[e]d and brushed [his] teeth." *Id.* Plaintiff was sent back to the Gulf unit, where inmates harassed him "for going to the [correctional officers] for help." *Id.* at 12. Plaintiff was moved later that same day to the Hotel unit. Plaintiff alleges that he tried to call the inmate hotline but that it was not working.

The next day, Plaintiff alleges that he told "a detective" that he had been sexually assaulted. During this time, the cell where the assaults occurred was apparently "taped off as a crime scene." *Id.* At some time later, Plaintiff was moved back to the cell where

3

the assaults occurred, despite his protestations to the "C/O" that he did not want to return to that cell. He was allegedly told that he would be placed in "Fox" if he did not return to his cell. Plaintiff alleges that he "felt like every time [he] asked for help [he] was punished for doing the right thing." *Id.* at 13.

Later in the month of November, Plaintiff "was moved to Alpha pending a major DR" and then to "Fox" after "being found guilty." *Id.* Plaintiff's allegations do not explain the reason for his disciplinary violation or whether it was related to his reporting of the alleged sexual assaults. Because Lake was in Fox, Plaintiff requested to stay in Alpha, but he was told he would be "physically" moved if he refused. *Id.* Lake then went back to population, and Plaintiff filed an emergency grievance to prevent his own return to population because he "was scared for [his] safety" and "afraid of retaliation from staff and inmates." *Id.* Plaintiff was told "it was not an emergency issue." *Id.* at 13-14. Plaintiff was also told "nothing" could be done because "it was in the hands of the state police" and that he would be issued a "DR" if he refused to move. *Id.* at 14.

Following his move to the Hotel unit, Plaintiff alleges that he was "still constantly being [harassed] by other inmates" and that he was "scared [to] ask for help" since he was repeatedly "told there was nothing that could be done." *Id.* He again attempted to call the inmate hotline but it was not working. On December 23, 2011, Plaintiff was moved "back to Fox pending a major DR." *Id.* In March 2012, "COII Brown" informed Plaintiff he would be moving to the Gulf unit, which Plaintiff protested because Lake was also housed in the Gulf unit. *Id.* at 14. Plaintiff stayed in Fox for another week, which he claims was in retaliation. Without specifying when, Plaintiff alleges that he "wrote to prisoner rights regarding this issue and got no response." *Id.* at 15.

On July 11, 2012, Plaintiff filed an "Offender/Inmate Grievance Submission Form," which he titled in his own handwriting as "Emergency." (Doc. 5-1 at 2.) He explained his grievance as follows:

> While I was on rec they brought Bubba Lake to Fox. I was the victim of rape by him last November. . . . I feel like I am being punished . . . . I now have to relive the trauma all over again. This is not right. I am now having flashbacks all over again. We are not even supposed to be in the same unit.

4

*Id.* Plaintiff's request was to be moved from Fox. On the same day, Plaintiff filed an "Informal Complaint & Plan For Resolution Form," which again requested that Plaintiff be transferred from Fox, since Lake had been placed in Fox, because Plaintiff "should not have to relive the mental torment again" after he had "already been the victim once":

> I tried an emergency grievance regarding the fact that Bubba Lake was moved to Fox. We are not allowed to be in the same unit because he raped me. I am having horrible flashbacks. I was told if I were to move[] to F2 and couldn't see him then I would feel better. I shouldn't have to be mentally tormented over and over again. I feel this is retaliation because [correctional officers] read my legal correspondence with the legal aid.

(Doc. 5-1 at 1.) The "Plan for Resolution," written and signed on July 13, 2012 by a member of the correctional staff, stated: "You are in a restricted unit. You and [Lake] have no contact, and will not have contact – You are safe." *Id.* Plaintiff did not mark on this form that he agreed to this "Plan for Resolution." *Id.*

On the "Grievance Investigation & Superintendent/District Manager/OOS Supplemental Housing Manager's Response," Defendant Rutherford was assigned to investigate Plaintiff's grievance, and on July 17, 2012 he noted on this form: "Placement for both inmates is appropriate and short term. [Inmates] did not recreate together and [had] no access to each other." (Doc. 10-1 at 1.) The recommendation on this form was that Plaintiff's grievance be "denied." *Id.* at 2. Superintendent of the SSCF, Potanas, then made a "decision," dated July 23, 2012, regarding Plaintiff's grievance, as follows: "Inmates were not out of respective cells for recreation at the same time. This was a short term placement. No further action required." *Id.* The form provides the "date response returned" as July 26, 2012. *Id.*

In his Amended Complaint, Plaintiff specifies how each Defendant was personally involved in handling Plaintiff's allegations of sexual assault. Plaintiff alleges that he spoke with Defendant Mickel about the sexual assaults approximately thirty minutes after reporting the assaults to "Officer Hayes." (Doc. 27 at 1.) Plaintiff alleges that Defendant Rutherford called Plaintiff to the "SOS office" to speak with him about the assaults and

5

that Rutherford and Mickel were both present for this meeting, during which Plaintiff detailed the assaults that occurred, including Lake's use of threats of "physical harm if Plaintiff did [not] go through the sexual acts." *Id.* at 2. Plaintiff alleges that Defendant Potanas "was the official who decided Plaintiff's appeal, [and] as a result, . . . Potanas was aware of the problem and failed to stop it." *Id.* at 3. Additionally, Plaintiff's Amended Complaint alleges that all of his "grievances have come up missing or were not filed properly by Staff at [the SSCF]." *Id.* at 4.

The facts Plaintiff presents in his Objection to the R & R are consistent with his Complaint and Amended Complaint in that Plaintiff maintains: "Over the course of several days approximately 11-10-2011 to 11-14-2011, [I] was sexually assaulted by my cellmate (Bubba Lake), and Corrections refuse[d] to do anything, even when [I] told the staff, my safety was not protected." (Doc. 35 at 1.) However, Plaintiff further alleges that since filing his Complaint in this case he has been "having problems [with] getting information," including "medical records, tapes of investigation, [and] statements from [three] staff members who [were] involved in the investigation." *Id.* He requests that the court deny Defendants' motion to dismiss "until such information be sent to [him]" and that the court "make sure such information be available" to him. *Id.* at 2.

## II.    Procedural Background.

The original Complaint was signed and dated July 22, 2012, and was served on that date. It was filed on or about July 30, 2012. The original Complaint sought relief and damages pursuant to 42 U.S.C. § 1983 for Defendants' alleged failure to protect Plaintiff from the physical and emotional harm caused by multiple sexual assaults perpetrated against Plaintiff during his incarceration at the SSCF. The Complaint named as Defendants Andrew Pallito, Vermont DOC Commissioner; Potanas, SSCF Superintendent; Rutherford, SSCF Chief of Security; and Mickel, SSCF Living Unit Supervisor. The Complaint alleged three causes of action, including the failure to act to protect Plaintiff from "a substantial risk of serious harm" that Defendants "were warned of"; the deliberate indifference to Defendants' "duty to use reasonable care to protect" Plaintiff from aggressive sexual assaults; and the disregard by Defendants for a

6

"substantial risk of safety." (Doc. 5 at 17.) Plaintiff sought a declaratory judgment that the acts of Defendants violated his rights under the Constitution, joint and several compensatory damages in the amount of $800, and punitive damages in the amount of $250,000, as well as his costs. *Id.* at 19.

Thereafter, Defendants filed a motion to dismiss for failure to state a claim, arguing that (1) Plaintiff's claims for monetary damages against Defendants in their official capacities were barred by the doctrine of sovereign immunity; (2) Plaintiff failed to allege a violation of a constitutional right or federal law and therefore failed to state a claim under 42 U.S.C. § 1983; (3) Plaintiff's claims against Defendants in their individual capacities failed to allege Defendants' personal involvement in any unlawful conduct; (4) Plaintiff failed to allege a physical injury as required by the PLRA; and (5) Plaintiff failed to exhaust his administrative remedies as required by the PLRA. (Doc. 17.)

On December 17, 2012, the Magistrate Judge issued a Report and Recommendation that the motion to dismiss be granted and the case be dismissed without prejudice, and further recommending Plaintiff be given 30 days to file an amended complaint. (Doc. 23.) Addressing Defendant's arguments, the Magistrate Judge concluded that (1) the claims against Defendants in their official capacities should be dismissed because Defendants were protected by sovereign immunity; (2) the claims should be dismissed because Defendants could not be held responsible for assaults that they had no reason to expect would occur and that following the assault Plaintiff failed to allege he "suffered serious injury"; (3) the claim against Andrew Pallito should be dismissed because Plaintiff alleged no facts to establish his personal involvement in the constitutional violations at issue; (4) Plaintiff's failure to allege a physical injury operates solely as a limitation on damages and not as a bar to a suit "altogether"; and (5) the claims should be dismissed because Plaintiff did not exhaust his administrative remedies and made no factual allegations that would excuse his failure to do so.

On January 9, 2013, Plaintiff filed his Amended Complaint. (Doc. 27.) The Amended Complaint removed Andrew Pallito, Commissioner of the Vermont DOC, as a defendant.

On February 25, 2013, this court issued its Opinion and Order adopting in part the Magistrate Judge's December 17, 2012 Report and Recommendation. (Doc. 29.) The court agreed with the conclusions that "Defendants were immune from suit under the Eleventh Amendment to the United States Constitution for any claims brought against them in their official capacities" and "that Plaintiff had failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act of 1995." (Doc. 29 at 2.) The court further agreed "that Defendants' motion to dismiss for failure to allege a physical injury should be denied." *Id.* The court did not adopt the remainder of the December 17, 2012 Report and Recommendation.

On April 24, 2013, Defendants filed the pending motion to dismiss. (Doc. 30.) Defendants reassert their contention that Plaintiff has failed to exhaust his administrative remedies as required by the PLRA. Defendants further argue that Plaintiff's Complaint and Amended Complaint should be dismissed for the same reasons set forth in the Magistrate Judge's December 17, 2012 Report and Recommendation that Plaintiff failed to set forth sufficient allegations of an Eighth Amendment violation.

On July 31, 2013, the Magistrate Judge issued a Report and Recommendation (the "R & R") that recommends the pending motion to dismiss be granted. The Magistrate Judge concluded that Plaintiff failed to exhaust his administrative remedies as required by the PLRA. The Magistrate Judge further concluded that Plaintiff failed to allege a viable Eighth Amendment claim. With regard to this latter conclusion, as the Magistrate Judge had done in his first Report and Recommendation, the Magistrate Judge construed Plaintiff's factual allegations to raise two distinct claims: (1) Defendants violated the Eighth Amendment when they failed to protect Plaintiff from the initial sexual assaults by his cellmate; and (2) Defendants violated the Eighth Amendment when they subsequently moved Plaintiff into the same housing unit as his assailant, placing him in fear for his safety.

8

With regard to the first claim, the Magistrate Judge concluded that Defendants were not deliberately indifferent to a substantial risk of harm to Plaintiff because there were no allegations of prior assaults or threats regarding the two inmates or requests from Plaintiff regarding Lake that would have put Defendants on notice of a risk of harm to Plaintiff. The Magistrate Judge noted, "Defendants cannot be held responsible for inmate assaults that they had no reason to think would occur." (Doc. 32 at 14.)

With regard to the second claim, the Magistrate Judge concluded that Plaintiff failed "to plead facts establishing [an] element of deliberate indifference, i.e., that the harm suffered—fear of another assault—was sufficiently serious to constitute an Eighth Amendment violation" because "the sole harm alleged is that [Plaintiff] had 'horrible flashbacks' and was 'mentally tormented over and over again.'" *Id.* at 14 (quoting Doc. 5-1 at 1). The Magistrate Judge noted that the "mere fear of an assault" was not "a sufficiently serious injury to state a claim under the Eighth Amendment" and that "without any subsequent assault" Plaintiff's claim under the Eighth Amendment was "not cognizable." *Id.* at 15, 16.

## III.   Conclusions of Law and Analysis.

### A.   Standards of Review.

A district judge must make a *de novo* determination of those portions of a magistrate judge's report and recommendation to which an objection is made. Fed. R. Civ. P. 72(b); 28 U.S.C. § 636(b)(1); *Cullen v. United States*, 194 F.3d 401, 405 (2d Cir. 1999). The district judge may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. 28 U.S.C. § 636(b)(1); *accord Cullen*, 194 F.3d at 405. A district judge, however, is not required to review the factual or legal conclusions of the magistrate judge as to those portions of a report and recommendation to which no objections are addressed. *Thomas v. Arn*, 474 U.S. 140, 150 (1985).

"It is well established that the submissions of a *pro se* litigant must be construed liberally and interpreted to raise the strongest arguments that they suggest," a policy "driven by the understanding that implicit in the right of self-representation is an

9

obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474-75 (2d Cir. 2006) (internal quotation marks, citations, and alterations omitted). The same is true for objections filed by *pro se* parties, which "are generally accorded leniency and should be construed to raise the strongest arguments that they suggest.'" *Williams v. Woodhull Med. & Mental Health Ctr.*, 891 F. Supp. 2d 301, 310 (E.D.N.Y. 2012) (quoting *DiPilato v. 7-Eleven, Inc.*, 662 F. Supp. 2d 333, 340 (S.D.N.Y. 2009)). Nevertheless, "even a [self-represented] party's objections to a [r]eport and [r]ecommendation must be specific and clearly aimed at particular findings in the magistrate's proposal, such that no party be allowed a second bite at the apple by simply relitigating a prior argument." *Dixon v. Ragland*, 2007 WL 4116488, at *1 (S.D.N.Y. Nov. 16, 2007) (internal quotation marks omitted).

In this case, Plaintiff has not challenged the Magistrate Judge's conclusions that his allegations do not state a claim to relief under the Eighth Amendment that is plausible on its face. Because the court finds that Plaintiff has failed to exhaust his administrative remedies, the court need not and will not adopt the Magistrate Judge's conclusions regarding Plaintiff's Eight Amendment claims.

**B.    Whether Plaintiff Has Failed to Exhaust His Remedies Within the Vermont Department of Corrections.**

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Although exhaustion is an affirmative defense under the PLRA, it can "be a basis for dismissal for failure to state a claim." *Jones v. Bock*, 549 U.S. 199, 216 (2007).

Exhaustion is "mandatory" and "required" for "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 524, 532

10

(2002); *see also Jones*, 549 U.S. at 211 ("There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court."); *Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) ("[U]nexhausted claims may not be pursued in federal court.").

Exhaustion must also be "proper," requiring that a prisoner "must . . . exhaust all 'available' remedies" through "compliance" with a prison's "critical procedural rules" and "deadlines." *Woodford v. Ngo*, 548 U.S. 81, 85, 90, 93 (2006) (holding that "the PLRA exhaustion requirement requires proper exhaustion"). That is, "'to properly exhaust administrative remedies prisoners must complete the administrative review process in accordance with the applicable procedural rules—rules that are defined not by the PLRA, but by the prison grievance process itself.'" *Espinal v. Goord*, 558 F.3d 119, 124 (2d Cir. 2009) (quoting *Jones*, 549 U.S. at 218). "The exhaustion inquiry thus requires that [a court] look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures." *Espinal*, 558 F.3d at 124; *see also Weygandt v. Pallito*, 2012 WL 4813522, at *3 (D. Vt. Sept. 18, 2012), *adopted* 2012 WL 4808985 (D. Vt. Oct. 9, 2012) ("Proper exhaustion of administrative remedies under the PLRA requires inmates to comply with and complete the prison grievance procedures in place at the institution to which they are confined.").

"The Vermont DOC has a comprehensive grievance process for inmates," which "includes multiple levels of administrative review." *Root v. Pallito*, 2012 WL 5392091, at *3 (D. Vt. Oct. 2, 2012), *adopted* 2012 WL 5390502 (D. Vt. Nov. 5, 2012).

> [Inmates] first lodge an informal complaint, either orally or in writing. If the situation is not resolved to the inmate's satisfaction within 48 hours, he may begin the formal grievance process. That process requires a DOC staff member to investigate and recommend a resolution to a supervisor. If the supervisor agrees, the resolution is reported to the inmate, who may then appeal to the facility superintendent if still not satisfied. In a similar fashion the inmate can appeal a decision of the facility superintendent to a Corrections Executive and, finally, a decision of the Corrections Executive can be appealed to the Commissioner of Corrections.

*Id.* (internal citations omitted); *see also Johnson v. Pallito*, 2012 WL 6093804, at *3 (D. Vt. Nov. 26, 2012), *adopted* 2012 WL 6093801 (D. Vt. Dec. 7, 2012) (same).

"[Alerting] the prison officials as to the nature of the wrong for which redress is sought" is not proper exhaustion under the PLRA and the Supreme Court's guidance because "notice alone is insufficient" to exhaust. *Macias v. Zenk*, 495 F.3d 37, 44 (2d Cir. 2007) (internal quotation marks omitted). Rather, Plaintiff was required to "complete the administrative review process in accordance with the applicable procedural rules" of the prison where incarcerated, the SSCF. *Espinal*, 558 F.3d at 124 (internal quotation marks omitted).

Here, the Magistrate Judge concluded that Plaintiff had failed to exhaust his administrative remedies "[b]ecause it was apparent from the face of his Complaint that [he] had not appealed his grievance to the Commissioner" and the Vermont DOC "grievance procedures requires that an inmate appeal a grievance all the way to the DOC Commissioner to have completed the grievance process." (Doc. 32 at 9.) Plaintiff signed and served his original Complaint on July 22, 2012, but his appeal to the SSCF Superintendent, Potanas, was not decided until the next day and was not returned to Plaintiff until July 26, 2012. Plaintiff thus "drafted and filed his first Complaint *before* Potanas had even decided his appeal, rendering it impossible that he could have then further appealed to the Commissioner (and received a decision back) before filing the Complaint." *Id.* at 10. Moreover, Plaintiff's Amended Complaint is essentially a concession that he did not complete the appeal process to the DOC Commissioner, as it states that the SSCF Superintendent, Potanas, "was the official who decided Plaintiff's appeal." (Doc. 27 at 3.) Plaintiff alleges that his "grievances have come up missing or were not filed properly by Staff at [the SSCF]," *id.* at 4; however, there are no allegations that these grievances were in any way related to a final appeal to the DOC Commissioner.

While the Second Circuit "has recognized that . . . the PLRA's exhaustion requirement is 'mandatory,' *Porter*, 534 U.S. at 524, certain caveats apply." *Giano v. Goord*, 380 F.3d 670, 677 (2d Cir. 2004). "These caveats fall into three categories: when (1) administrative remedies are not available to the prisoner; (2) defendants have either

waived the defense of failure to exhaust or acted in such [a] way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement." *Ruggiero v. County of Orange*, 467 F.3d 170, 175 (2d Cir. 2006) (citing *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004)).[2]

In Plaintiff's case, administrative remedies were available to Plaintiff when he filed his grievances and he was aware remedies existed as he marked on his Complaint that there was a "prisoner grievance procedure" at the facility where he was incarcerated at that time. (Doc. 5 at 3.) He also noted that he availed himself to this "grievance program" by filing an "emergency grievance." *Id.* There are no allegations that the SSCF failed to provide a grievance procedure to address Plaintiff's specific concerns in this case, *see Hemphill*, 380 F.3d at 686-87, and there are no allegations that the facility failed to inform Plaintiff of this grievance procedure. *See Ruggiero*, 467 F.3d at 178 (considering whether prison failed to timely provide an inmate handbook). Because "the prison provided grievance procedures that inmates . . . could utilize," Plaintiff was required to utilize those procedures before proceeding to court. *Hemphill*, 380 F.3d at 686.

Notwithstanding the existence of a grievance procedure generally available to any SSCF inmate, Plaintiff raises several allegations that the procedure was not available to him specifically, including allegations that he was told "nothing" could be done, that he felt like he was being retaliated against for attempting to remedy his problems with Lake, and that he did not contact the Superintendent "because [he] felt like [he] wouldn't be taken seriously." (Doc. 5 at 5.) "The test for deciding whether the ordinary grievance procedures were available must be an objective one: that is, would 'a similarly situated individual of ordinary firmness' have deemed them available." *Hemphill*, 380 F.3d at 688 (quoting *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003)). Here, assuming the

---

[2] Although Second Circuit decisions subsequent to *Woodford*, 548 U.S. 81, "have questioned the continued viability of [the *Hemphill*] framework," no decision of the Second Circuit has yet determined that *Hemphill* is no longer viable. *Amador*, 655 F.3d at 102.

13

truth of Plaintiff's allegations that he felt retaliated against and that he was told by certain members of the prison staff that "nothing" could be done, this would not excuse his failure to appeal his grievances because "threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system." *Hemphill*, 380 F.3d at 688 (noting such appeals neutralize the "threatened retaliatory conduct from prison employees"); *see also Snyder v. Whittier*, 428 F. App'x 89, 91 (2d Cir. 2011) (concluding defendant failed "to allege any specific threats related to the grievance procedures that would have led any such similarly situated individual to believe that these procedures were unavailable").

Defendants have not waived the defense of failure to exhaust because Defendants have "continued to assert [the defense] throughout this litigation," *Johnson v. Rowley*, 569 F.3d 40, 45 (2d Cir. 2009), nor are there sufficient allegations that Defendants have acted in a manner that would estop them from asserting the defense of failure to exhaust. *See Amador*, 655 F.3d at 102 (directing courts to consider "whether defendants' own actions inhibiting the inmate's exhaustion of remedies estops one or more of the defendants from raising the exhaustion defense"); *see also Ruggiero*, 467 F.3d at 178 (recognizing "that if the defendants' own actions prevent a prisoner from pursuing administrative remedies, the prisoner's failure to avail himself of those remedies cannot bar his access to the courts" but requiring prisoner to identity the "affirmative act by prison officials that would have prevented him from pursuing administrative remedies"). Plaintiff's allegation that the staff at the SSCF did not take him "seriously" (Doc. 5 at 11) and that the "staff don't care" (Doc. 35 at 1) does not rise to the level of affirmative action required to estop Defendants from asserting Plaintiff's failure to exhaust his administrative remedies. *See Amador*, 655 F.3d at 103 (noting the doctrine of estoppel applies "when defendants took affirmative action to prevent [prisoner] from availing himself of grievance procedures," including "verbal and physical threats of retaliation, physical assault, denial of grievance forms or writing implements, and transfers") (internal quotation marks and citations omitted).

14

Finally, Plaintiff has not alleged any special circumstance that would justify his failure to comply with Vermont DOC's grievance process. *See Giano*, 380 F.3d at 678-79 (determining "failure to exhaust was justified" when prisoner reasonably interpreted DOC regulations as foreclosing administrative remedies for "disciplinary proceedings," that is, that the proceedings were "non-grievable"). Plaintiff alleges that in November 2011 he filed an emergency grievance and was told "it was not an emergency issue" (Doc. 5 at 13-14); however, there are no allegations that any prison staff told Plaintiff that his issue was not otherwise grievable. *See Gilbeau v. Pallito*, 2012 WL 2416719, at *5 (D. Vt. May 22, 2012), *adopted* 2012 WL 2416654 (D. Vt. June 26, 2012) (noting that "[c]ourts in this circuit have held that an inmate's reasonable belief that an issue is not grievable, based upon information provided by his jailers, is a 'special circumstance' that justifies the prisoner's failure to exhaust the administrative process").

For the foregoing reasons, the court ADOPTS the Magistrate Judge's R & R addressing the exhaustion of administrative remedies and agrees that Plaintiff has failed to exhaust the administrative remedies available to him. Because "PLRA exhaustion is a condition that must be satisfied *before* the courts can act on an inmate-plaintiff's action," Plaintiff's lawsuit must be dismissed without prejudice, and the court therefore GRANTS Defendants' motion to dismiss. *Messa v. Goord*, 652 F.3d 305, 309 (2d Cir. 2011); *see also Snyder*, 428 F. App'x at 92 ("Where, as here, a prisoner fails to properly exhaust his administrative remedies before filing suit, the action must be dismissed."). The court does not adopt the remainder of the R & R.

## CONCLUSION

For the foregoing reasons, the court ADOPTS IN PART the Magistrate Judge's R & R. (Doc. 32.) The court therefore GRANTS Defendants' motion to dismiss (Doc. 30) and hereby DISMISSES this case.

SO ORDERED.

Dated at Rutland, in the District of Vermont, this 3rd day of December, 2013.

*/s/ Christina Reiss*

Christina Reiss, Chief Judge
United States District Court